IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

JEROME ALSTON,                              *

     Plaintiff,                         *

v.                                          *          Civ. No. DLB-20-2388

HOLY CROSS HEALTH, INC.,                    *

     Defendant.                         *

## MEMORANDUM OPINION

Jerome Alston filed suit against his former employer, Holy Cross Health, Inc. ("Holy Cross"), asserting claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* ECF 1 & 13. He alleges that Holy Cross discriminated against him because of his race (Count I) and disability (Count II), retaliated against him for complaining about the discrimination (Count III), and subjected him to a hostile work environment (Count IV). Holy Cross moves for summary judgment on all claims. ECF 34. The motion is fully briefed. ECF 34-1, 35 & 36. No hearing is necessary. *See* Loc. R. 105.6 (D. Md. 2021). For the following reasons, the motion is granted, and judgment is entered in favor of Holy Cross.

## I.      Background

Holy Cross hired Alston as a PRN respiratory therapist on October 13, 2014. ECF 34-2, at 16 (56:6–9). His duties included performing patient assessments, implementing and evaluating care, providing breathing treatments, maintaining patients on respirators, and working with physicians, medical professionals, and other staff. *Id.* (56:15–21). His schedule varied. *Id.* at 18 (61:3–14; 64:3–13). He was hired on a "zero hours per week" basis and was assigned shifts based on the hospital's needs. *Id.*; *see also id.* at 97 (offer letter). Holy Cross could require him to work

any shift at any time, day or night.  *Id.* at 19–20 (68:5; 69:4–11).  Alston generally worked below full-time hours in any given month.  *Id.* at 19 (66:9 – 68:4).

Before he started working for Holy Cross, Alston received a kidney transplant.  *Id.* at 22 (78:5–9).  As a result, his immune system is compromised.  *Id.* (78:10 – 79:15).  In October 2014, before his start date, Alston shared this information with his soon-to-be supervisor, Respiratory Program Coordinator Patricia Fields, and Mary Fowler, Critical Care Director.  *Id.* at 17, 22 (58:3– 7; 77:11 – 80:11).  He stated that as a result of his condition, he could not work in negative pressure isolation rooms.[1]  *Id.*  Fields responded that it would not be a problem, and Alston understood that other respiratory care therapists would fill in for him in those situations.  *Id.* at 23–24 (83:4 – 85:6).  And so it was.  When Alston encountered a situation involving a patient in a negative isolation room, he found a coworker to cover for him.  *Id.* at 23, 42 (86:2 – 87:4; 160:6–18).  He never was required to work in a negative pressure isolation room during his employment with Holy Cross.  *Id.* at 26 (93:3 – 94:13).  At some point in 2016, Fields transferred to a different facility, and Alston began being supervised by Craig Ditzenberger, the Director of Respiratory Therapy.  *Id.* at 17 (58:20 – 59:22).  Alston could not recall if he ever informed Ditzenberger or anyone else at Holy Cross about his health condition.  *Id.* at 24 (87:5 – 88:9).

Between 2014 and 2016, Alston received several positive performance evaluations.  ECF 35-1, at 102–57.  In April 2015, he was rated satisfactory in all fields and received a recommendation of regular employment.  *Id.* at 156.  His manager commented that he was "always willing to come in when needed if he possibly can" and was "a great member of the team."  *Id.* at 157.  In May 2016, he was rated satisfactory in all assessed categories except one, in which he was

---

[1] Negative room pressure is an isolation technique used by hospitals to prevent the spread of airborne contagious diseases.  Ventilation lowers air pressure in the isolation room, allowing air to flow in but not out.  ECF 34-2, at 22 (79:5 – 80:10).

rated exceeds satisfactory. *Id.* at 144–51. For that category, the evaluator noted that Alston self-reported a mistake that no one else would have caught. *Id.* at 148.

In October 2016, Alston, an African American, began receiving more day shift assignments and noticed that a Caucasian PRN respiratory therapist, Nick Walden, was receiving more night shift assignments. *Id.* at 27 (97:15 – 98:4). Walden was hired around the same time as Alston, and they had common duties. *Id.* (99:16 – 101:11). Alston mostly received night shifts assignments at the start of his employment, and Walden mostly received day shift assignments; Alston estimates that approximately 90 percent of their shifts were night and day shifts, respectively, during their first two years. *Id.* at 27–29 (100:15 – 101:7; 107:4–8). Alston testified that he was told by Fields and Fowler when he was hired that he was being hired to work night shifts, even though his offer letter does not reflect that understanding. *Id.* at 19–20 (68:5 – 69:11). Night shifts were preferable because they paid more. *Id.* at 29 (106:1–11).[2] Between October 2016 and his termination in February 2017, Alston complained about the change in shift assignments to Ditzenberger, Interim Respiratory Program Coordinator Michael Adkins, and Division Administrative Assistant Joan Donlon. ECF 35-1, at 159–184. He stated several times that he viewed the shift assignments as discrimination and favoritism. *Id.*

Ditzenberger explained to Alston that he had been hired to work on an "as needed" basis and not only for night shifts. ECF 34-4, at 2, 5. In an October 18 email, he stated that Walden had started requesting night shifts, and Holy Cross was granting some of those requests out of fairness. *Id.* at 5. Ditzenberger said that if more than one therapist stated they were available for shifts, Holy Cross would "attempt to grant the shifts as evenly as possible." *Id.* Walden had gotten a job

---

[2] Alston argues in his brief that situations involving patients in negative pressure isolation rooms arose less frequently on the night shift, but that statement is not supported by his testimony or other evidence in the record. *See* ECF 34-2, at 22–23 (80:11 – 83:2).

at another hospital that affected his availability and shift requests.  ECF 34-2, at 28 (101:4–7).

Ditzenberger noted that Alston still had more shifts scheduled than any other per diem staff

member for that scheduling period "by double or more."  ECF 34-4, at 5.  He closed by directing

Alston to Human Resources.  *Id.*  Alston never informed Ditzenberger about his condition or

inability to work in negative pressure isolation rooms.  *Id.* at 2.  Separately, Adkins told Alston

that, for one of the scheduling periods, Walden was scheduled for five night shifts and one day

shift while Alston was scheduled for five night shifts and seven day shifts, per Alston's availability

and previous request to be filled in on any available date, including day shifts.  ECF 35-1, at 161.

Donlon told Alston on at least one occasion that Walden had submitted his shift preferences before

Alston, which prioritized Walden's requests.  *Id.* at 170; ECF 34-2, at 29 (108:17–21).  Alston

testified that he would have had no problem with Holy Cross fairly accommodating Walden's

availability, but he took issue with the underhanded way it was done.  ECF 34-2, at 29 (107:4–17).

In December 2016, Alston contacted Human Resources Representative Samuel Bloom

about his shift assignments.  *Id.* at 31 (115:11–22).  Alston testified that his concerns were

disregarded.  *Id.* at 31–32 (116:1 – 118:16).  Bloom repeatedly cancelled and rescheduled their

meetings, and when a meeting did occur, he took calls on other matters and cut the meeting short

before Alston could fully describe his concerns.  *Id.*  Alston gave Bloom documentation regarding

his concerns about discrimination, including time sheets and emails.  *Id.* at 32 (118:17 – 119:21).

Neither Bloom nor anyone else with Human Resources followed up or indicated anything would

be done to address Alston's concerns.  *Id.* (118:10–16).

Also in December 2016, Kimberly Elliott joined Holy Cross as the Interim Acting Chief

Nursing Officer.  ECF 34-3, at 2.  Alston did not inform Elliott about his condition or inability to

work in negative pressure isolation rooms.  ECF 34-2, at 26–27 (95:14 – 97:7); ECF 34-3, at 2.

Two issues involving Alston came to Elliott's attention in December 2016.  ECF 34-3, at 2–3.  On December 22, the wife of a patient complained that Alston asked her husband questions rather than immediately treating him and insultingly told her, "Don't tell me how to do my job."  *Id.* at 2, 6. Joanne Ogaitis, an administrative coordinator, emailed Elliott regarding the incident.  *Id.*  Ogaitis reported the wife's concerns, Alston's side of the story (the wife was rude from the beginning and he could not get in a word to explain his actions), and the account of another respiratory therapist (Alston and the patient's wife were loudly yelling at each other, and Alston stated that the wife had "a race issue").  *Id.*  The next week, on December 29, Walden complained to Ditzenberger that Alston had left him unfinished, urgent work and that he "leaves early and gives no report." *Id.* at 10.  Ditzenberger investigated by reviewing Alston's timecards and discovered how often he left early.  *Id.* at 9.  Later that day, Ditzenberger informed Elliott that Alston regularly was leaving his shifts about 30 minutes early, sometimes before replacement therapists arrived to receive a report on patients.  *Id.* at 2–3.  In his email to Elliott, Ditzenberger noted that the issue had been addressed with Alston and other staff on more than one occasion and he "did not see anyone else clocking out early for the past two pay periods."  *Id.* at 9.  He also noted reports of Alston leaving unfinished priority work for the next shift and suggested that the respiratory therapy department should "bring in some fresh faces" because the current PRN pool "is not very reliable[.]"  *Id.*  He closed by stating that this was "not the first time [Alston's] name ha[d] come across [his] email over the past year[.]"  *Id.*

On the morning of December 30, Elliott met with Alston.  *Id.* at 3.  She addressed his shift requests, which she characterized as "demands" followed by "claims that he is being discriminated against" if he does not get what he wants.  *Id.* at 12.  She also addressed his clocking in and out, and she instructed him that he was not allowed to clock out more than six minutes before his shift

end time. *Id.* at 3, 12; ECF 34-2, at 37 (139:14 – 140:2). She instructed that Alston was to contact her on her cell phone to report any time he was absent or departed early. ECF 34-3, at 3. In a contemporaneous memo, Elliott noted that Alston listened to her concerns, but his response "was loud and had frequent eye rolling." *Id.* at 12. She told him three times that if he did not stop yelling and rolling his eyes, she would ask him to clock out for his shift. *Id.*; ECF 34-2, at 37 (138:3–22). At the end of the meeting, Elliott warned that further issues would result in progressive discipline, including potential termination. ECF 34-3, at 12; ECF 34-2, at 38 (141:8–12). Alston testified that, at the meeting, he disputed the allegations of the patient's wife, but Elliott did not listen and insisted that he "needed to own it." ECF 34-2, at 35 (131:14–22). He also testified that Elliott did not provide documentation to him regarding the timekeeping issue and that no one had ever told him that there was a problem before the meeting. *Id.* at 36 (134:1 – 135:6). Alston believes that Holy Cross manufactured the performance issues to discredit him and create cover for his eventual discriminatory termination. *See id.* at 35–36 (132:16 – 135:6). However, he admitted that he usually would leave early once the next shift arrived. *Id.* at 37 (140:3–10).

In early 2017, other staff members who did not understand Alston's health condition were complaining about having to cover for him in negative pressure isolation rooms. *Id.* at 25 (91:13–22). Alston says that, in response to the complaints, Elliott announced a policy change that would require all respiratory therapists to be available to treat all patients. *Id.* (91:22 – 92:8). Alston viewed this change as a withdrawal of an accommodation for his disability and a threat to his health. *Id.* at 26 (94:15–20). The record includes no documentation or other evidence reflecting this policy change. Alston was terminated before he encountered another treatment situation

involving a patient in a negative pressure isolation room, so he never was asked or required to work in a negative pressure isolation room after the policy change. *Id.* (94:3–8).

On February 9, 2017, Alston left work at 7:03 a.m. despite his night shift ending at 7:30 a.m. *Id.* at 38 (143:1–8). Alston did not ask Elliott for permission to leave early, even though she was at the hospital that morning. ECF 34-3, at 3; ECF 34-2, at 41 (155:2–13). On February 16, after learning about Alston's early departure, Elliott contacted the administrative coordinators who were working on February 9, Tina Kennedy and Joanne Ogaitis. ECF 34-3, at 3. Both denied that Alston had informed them that he was leaving early. *Id.* at 14–15. Ogaitis stated specifically that she had a plan in place for occasions when only one respiratory therapist was on duty and two therapists were needed at the same time, and she did "not recall putting that plan in motion on that particular morning." *Id.* at 15. Alston testified that he called Ogaitis around 6:45 a.m. on February 9 and received permission to leave 15 minutes early due to inclement weather. ECF 34-2, at 39, 49 (147:12–17; 185:22 – 187:21).

Elliott terminated Alston's employment with Holy Cross on February 16. *Id.* at 38 (141:21 – 142:2). The official reasons for Alston's termination were insubordination, based on his violation of Elliott's express instructions not to clock out early without permission, and reckless conduct, based on the threat to patient care and safety posed by his decision to leave his shift early without notifying management. *Id.* at 99 (termination letter). Alston testified that he tried to tell Elliott that he had followed her instruction and contacted Ogaitis but Elliott did not allow him to explain. *Id.* at 39, 41 (147:18 – 148:5; 153:3 – 154:21).

Alston exhausted his administrative remedies, and on August 18, 2020, he filed this race and disability discrimination lawsuit. At the conclusion of discovery, Holy Cross filed a motion for summary judgment on all claims.

## II.     Standard of Review

Summary judgment is appropriate when the movant "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To meet its burden, the party must identify "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials" in support of its position. Fed. R. Civ. P. 56(c)(1)(A). The relevant inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986). The Court must "view the evidence in the light most favorable to the nonmoving party" and avoid "weigh[ing] the evidence or mak[ing] credibility determinations." *Lee v. Town of Seaboard*, 863 F.3d 323, 327 (4th Cir. 2017) (quoting *Jacobs v. N.C. Admin. Off. of the Courts*, 780 F.3d 562, 568–69 (4th Cir. 2015)) (internal quotation marks omitted). However, the Court also must abide by its "affirmative obligation . . . to prevent factually unsupported claims and defenses from proceeding to trial." *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 1993) (quoting *Felty v. Graves-Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987)) (internal quotation marks omitted).

If the moving party demonstrates "an absence of evidence to support the nonmoving party's case," the burden shifts to the nonmoving party to "present specific facts showing that there is a genuine issue for trial." *Humphreys & Partners Architects, L.P. v. Lessard Design, Inc.*, 790 F.3d 532, 540 (4th Cir. 2015). A factual dispute is genuine only where there is sufficient evidence to permit a reasonable jury to find in the nonmoving party's favor. *Id.*; *see also Perkins v. Int'l Paper Co.*, 936 F.3d 196, 205 (4th Cir. 2019). "To create a genuine issue for trial, 'the nonmoving party must rely on more than conclusory allegations, mere speculation, the building of one inference

upon another, or the mere existence of a scintilla of evidence.'" *Humphreys & Partners Architects*, 790 F.3d at 540 (quoting *Dash v. Mayweather*, 731 F.3d 303, 311 (4th Cir. 2013)).

## III.  Discussion

### A.  Title VII Race Discrimination

Alston claims Holy Cross violated Title VII by terminating him based on his race.  "Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, as amended, prohibits employment discrimination."  *Ricci v. DeStefano*, 557 U.S. 557, 577 (2009).  The Act reaches "status-based discrimination" by providing "basic workplace protection such as prohibitions against employer discrimination on the basis of race, color, religion, sex, or national origin, in hiring, firing, salary structure, promotion and the like."  *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 342 (2013) (citing 42 U.S.C. § 2000e-2(a)).  The plaintiff in a Title VII employment discrimination case bears the burden of proving the defendant discriminated against him "because of a protected characteristic."  *DeJarnette v. Corning Inc.*, 133 F.3d 293, 298 (4th Cir. 1998) (citing *Lovelace v. Sherwin-Williams Co.*, 681 F.2d 230, 243 (4th Cir. 1982)).  The burden of proof may be satisfied by "direct evidence or by circumstantial evidence . . . ."  *Mitchell v. Data Gen. Corp.*, 12 F.3d 1310, 1314 (4th Cir. 1993).  When, as here, a plaintiff does not allege direct evidence of employment discrimination, claims under Title VII proceed under the *McDonnell Douglas* burden-shifting framework.  *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *Foster v. Univ. of Md.-E. Shore*, 787 F.3d 243, 249–50 (4th Cir. 2015).  At the first step of the *McDonnell Douglas* framework, the plaintiff must establish a *prima facie* case of employment discrimination. *Guessous v. Fairview Prop. Invs., LLC*, 828 F.3d 208, 216 (4th Cir. 2016).  A *prima facie* case of disparate treatment involves four elements: "(1) membership in a protected class; (2) satisfactory job performance; (3) adverse employment action; and (4) different treatment from similarly

situated employees outside the protected class" or other circumstances that raise an inference of unlawful discrimination. *Coleman v. Md. Court of Appeals*, 626 F.3d 187, 190 (4th Cir. 2010), *aff'd*, 566 U.S. 30 (2012); *Bryant v. Aiken Reg'l Med. Ctrs. Inc.*, 333 F.3d 536, 544–45 (4th Cir. 2003).

Once a plaintiff establishes a *prima facie* case of discrimination, the burden shifts to the employer to produce evidence showing a legitimate and non-discriminatory reason for the adverse employment action. *Guessous*, 828 F.3d at 216. The burden then returns to the plaintiff to demonstrate by a preponderance of the evidence that the stated reason is pretext for discrimination. *Id.* The plaintiff "may succeed in this either by directly persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981). To survive summary judgment, the plaintiff "must cast sufficient doubt upon the genuineness of the explanation to warrant a jury's consideration of possible alternative and discriminatory motivations for the firing." *Guessous*, 828 F.3d at 218 (quoting *King v. Rumsfeld*, 328 F.3d 145, 154 (4th Cir. 2003) (Gregory, J., dissenting)).

There is no dispute that Alston, an African American, is a member of a protected class. There also is no dispute that his termination is an adverse employment action.[3] The Court assumes without deciding that Alston can prove he was performing satisfactorily.

As for the fourth element, Alston relies on comparator evidence to show circumstances of unlawful discrimination. To establish a valid comparator, "the plaintiff must produce evidence that the plaintiff and comparator 'dealt with the same supervisor, [were] subject to the same

---

[3] In his opposition, Alston identifies his termination as the only adverse action at issue. ECF 35, at 11–12.

standards and . . . engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.'" *Haynes v. Waste Connections, Inc.*, 922 F.3d 219, 223–24 (4th Cir. 2019) (quoting *Haywood v. Locke*, 387 F. App'x 355, 359 (4th Cir. 2010) (unpublished)).   Alston argues that Holy Cross treated Walden, a Caucasian respiratory therapist, better than it treated him because the hospital gave to Walden the night shifts that Alston preferred.   Setting aside whether Alston has produced evidence of discriminatory shift assignments, this comparator argument is off base.   First, there is no evidence that the decisionmakers responsible for the shift assignments were involved in the decision to terminate Alston or vice versa.   Second, the adverse action is termination, and Elliott fired Alston because she believed that he left work early without permission, so the relevant comparator conduct is leaving work early without permission.   There is no evidence that Walden, or another person outside Alston's protected class, impermissibly left work before their shift ended and was not fired or otherwise punished.   Without any evidence of a comparator who was "engaged in the same type of misconduct attributed to" him, Alston cannot rely on comparator evidence to satisfy his burden to show circumstances of unlawful discrimination.   *See Bryant v. Bell Atl. Md., Inc.*, 288 F.3d 124, 134 (4th Cir. 2002) (rejecting four proffered comparators because, unlike the plaintiff, none of them failed to work assigned overtime shifts on multiple occasions).   Other than this unsuccessful comparator evidence, Alston does not identify other circumstances that might raise an inference of discrimination.

Alston has failed to meet his burden of establishing a *prima facie* case of unlawful discrimination.   Summary judgment on the race discrimination claim, therefore, is warranted for Holy Cross.

Even if Alston had met his burden of establishing a *prima facie* case, his claim still would fail as a matter of law because he has not raised a genuine dispute of material fact regarding whether Holy Cross's stated reason for his termination was pretext for race discrimination.  Holy Cross has produced evidence of a legitimate, non-discriminatory reason for Alston's termination. Alston was fired on February 16, 2017 because Elliott believed that he left work early on February 9 without supervisor permission in violation of her December 30, 2016 verbal instruction that he not clock out more than six minutes before the end of his shift without notifying her or another supervisor.  There is no dispute that Alston left early on February 9 and that he did not notify Elliott.  Both administrative coordinators working that morning, Kennedy and Ogaitis, informed Elliott via email on February 16 that Alston had not told them that he would be leaving early on February 9.  Later on February 16, Elliott made the decision to terminate Alston.  In the February 16 notice of termination, Elliott referenced her instruction not to clock out early without permission and her contemporaneous warning that "future early clock outs could result in disciplinary action up to and including termination."  ECF 34-2, at 99.  She stated that Alston nonetheless clocked out 27 minutes early on February 9 and did not notify management before leaving.  The notice indicates that Elliott regarded Alston's conduct as insubordinate because he did not follow her instruction and reckless because "it is critical that approval is requested for early departures so that cases can be safely handed over to another therapist and to ensure patient safety."  ECF 34-3, at 3.

In response to this legitimate, non-discriminatory reason for his termination, Alston makes several unsuccessful arguments that the stated reason is pretext for discrimination.  He claims that he did, in fact, receive permission from Ogaitis to leave early on February 9, a contention supported only by his own deposition testimony.  This argument misses the mark.  Even if Ogaitis had granted Alston permission to leave early, which she denied doing, Alston has not identified any record

evidence that Elliott, when she fired him, believed that Ogaitis had granted him permission to leave early or that Elliott had reason to doubt Ogaitis's and Kennedy's reports that Alston left early without their permission.  The subjective belief of the decisionmaker, Elliott, is what matters.  As long as the proffered reason for termination "truly was the reason," the Court does not "decide whether [an employer's] reason [for terminating an employee] was wise, fair, or even correct." *Walker v. Mod-U-Kraf Homes, LLC*, 775 F.3d 202, 211 (4th Cir. 2014) (quoting *DeJarnette*, 133 F.3d at 299).  Elliott heard from Ogaitis and Kennedy on February 16 that Alston left work early on February 9 without permission.  For that reason, she fired him later that day.  There is no evidence calling into question Elliott's honest belief, even if incorrect, that Alston violated her earlier instruction not to leave work early without permission.

Courts presented with similar facts have granted summary judgment in favor of the employer.  In *Holland v. Washington Homes, Inc.*, the Fourth Circuit affirmed summary judgment in favor of an employer because the plaintiff failed to genuinely dispute that the employer's "proffered legitimate explanation was false."  487 F.3d 208, 215 (4th Cir. 2007).  The employer's stated reason for the plaintiff's termination was physical threats the plaintiff allegedly made against a vice president of the company.  *Id.* at 212.  The plaintiff disputed making those threats, and the court assumed for purposes of summary judgment that the dispute would resolve in the plaintiff's favor.  *Id.* at 218.  The court nonetheless held that the employer was entitled to judgment as a matter of law because nothing in the record supported an inference that the decisionmaker "did not believe that [the plaintiff] had threatened [a vice president] when he made the decision to fire him." *Id.* at 215.  Rather, "the uncontested evidence established that [the decisionmaker] honestly believed that" the plaintiff deserved to be discharged for making threats, "regardless of whether

[he] did in fact issue the threats." *Id.* at 217.  Because it is "the perception of the decisionmaker which is relevant[,]" whether the plaintiff did what he was accused of was beside the point.  *Id.*

Similarly, in *Pettaway-Darden v. Woodbourne Center, Inc./Nexus Center*, this court held, on summary judgment, that a plaintiff did not genuinely dispute the material fact that her employer fired her for falling asleep on the job, even though the plaintiff disputed that she had fallen asleep. No. ELH-16-3100, 2017 WL 5885658, at *17–21 (D. Md. Nov. 28, 2017).  While the court assumed that the plaintiff had not fallen asleep, her employer "produced evidence sufficient to demonstrate that it terminated [her] based upon its informed belief that, on the night in question," she had fallen asleep. *Id.* at *17–18.  Two individuals present that night consistently reported that the plaintiff had fallen asleep, and her supervisor testified that she had viewed recordings of the night in question and had seen the plaintiff "at the table rocking back and forth, appearing to be asleep . . . [n]odding her head." *Id.* at *17.  The court noted that it "does not sit as a kind of super-personnel department weighing the prudence of employment decisions made by firms charged with discrimination" and concluded that the plaintiff had failed to show that her employer's reason for her termination was pretext for discrimination. *Id.* at *21 (quoting *DeJarnette*, 133 F.3d at 298–99).  Other courts have held similarly. *See, e.g.*, *Addison v. CMH Homes, Inc.*, 47 F. Supp. 3d 404, 421 (D.S.C. 2014) (rejecting discrimination claim where the plaintiff denied "most of the alleged inappropriate workplace behavior" but failed to show that the decision maker "questioned the validity of" his low performance scores and coworker statements about his inappropriate behavior); *Carson v. Giant Food, Inc.*, 187 F. Supp. 2d 462, 485 (D. Md. 2002) (holding employee failed to raise a material dispute about pretext when he genuinely disputed a coworker's version of a confrontation that led to his termination but presented "no evidence that [the decisionmaker]

14

did not actually believe" the coworker).  As in these cases, Alston has not submitted any evidence rebutting Holy Cross's evidence that Elliott truly believed he left work early without permission.[4]

Alston's other efforts to cast doubt on the legitimacy of the proffered reason for his termination are similarly unavailing.  Alston claims that "the alleged timekeeping issue was manufactured *post hoc*" and he was not given "notice, warning, or chance to correct the issue whatsoever."  ECF 35, at 15.[5]  This claim has no evidentiary support and is belied by the undisputed record evidence, including Alston's deposition testimony, that Elliott told Alston on December 30, 2016 to stop clocking out more than six minutes early and warned him to not do so in the future.

Alston next argues that Elliott did not implement progressive discipline for his first violation of her verbal warning and his termination was a disproportionate response to his purported misconduct.  He relies on the Fourth Circuit's observation that a "disproportionate response to a minor workplace infraction suggests pretext . . . ."  *Wilcox v. Lyons*, 970 F.3d 452, 457 (4th Cir. 2020).  In *Wilcox*, the court stated in *dicta* that a plaintiff's allegations that she was fired for insubordination after merely requesting clarification about an attendance policy and time to review a reprimand letter, coupled with a short time lapse between her earlier protected activity

---

[4] Because Alston has not offered any evidence that Elliott did not or could not genuinely believe he left work early without permission, the cases Alston cites are inapt.  *See Fordyce v. Prince George's Cnty.*, 43 F. Supp. 3d 537, 550–51 (D. Md. 2014) (finding pretext disputed when an internal investigation supporting the plaintiff's version of events meant that the employer "could not genuinely believe that it was justified" in disciplining her); *see also Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 144 (2000) (finding genuine dispute as to pretext when the employee offered evidence suggesting the decisionmaker could not have reasonably believed that he was responsible for the alleged misconduct).

[5] In support of this argument, Alston cites his deposition testimony that Elliott never raised the issue of him being late to his shifts.  *See* ECF 34-2, at 35–36 (132:16 – 133:1, 134:1–18, 135:2–6).  This testimony does not call into question Elliott's reason for terminating Alston because she did not fire him for arriving late.  She fired him for leaving early.

and her termination, would be sufficient to plead the causation element of a *prima facie* retaliation claim under Title VII. *Id.* But those facts are not analogous. Here, the record contains undisputed evidence that Elliott did not view Alston's alleged timekeeping violation as minor. Rather, as she expressed in the notice of termination, she viewed it as insubordination because he violated her express instructions and reckless because it posed a threat to patient care and safety. An early departure from a hospital shift by a respiratory therapist—without notifying the appropriate person and despite a warning and an express instruction to do so—is not the sort of "minor workplace infraction" at issue in *Wilcox*. And while Elliott did not implement progressive discipline in the form of multiple warnings, she did warn Alston, six weeks before the infraction, that his failure to follow her instruction could result in consequences up to termination. Her decision to terminate, rather than discipline, him after his first violation of her instruction is consistent with her warning and does not undermine the legitimacy of the proffered reason for his termination.

Finally, Alston argues that the stated reason for his termination is suspect because it was Walden who initially reported his practice of clocking out early. This argument, too, is unpersuasive. Alston does not dispute that he clocked out early before Elliott counseled him on December 30. How Elliott learned that Alston was clocking out early is irrelevant. And there is no evidence that Walden had anything to do with the events on February 9 that led to Alston's termination or with Elliott's decision to terminate him.[6]

Alston has not put forth evidence that casts doubt on the legitimacy of Holy Cross's explanation for his termination. No reasonable factfinder could conclude that Holy Cross's reason

---

[6] Alston also appears to argue that the proffered reason for his termination was pretext for discrimination because he never was able to present his side of the story regarding the December 22 interaction with the patient's wife. But there is no evidence that Elliott fired him because of his conduct in that interaction. Rather, the evidence indicates Elliott fired him for leaving early without permission in violation of her express instruction.

for termination was pretext for race discrimination.  The motion for summary judgment is granted as to Count I.

### B.  ADA Claims (Count II)

In Count II of his amended complaint, Alston alleges both discriminatory discharge because of his disability and failure to accommodate.  *See* ECF 13, ¶¶ 37–52.  Holy Cross addressed both theories of liability under the ADA in its motion, but in his opposition, Alston addressed only the failure to accommodate claim.  The Court addresses both.

#### 1.  Discriminatory Discharge Based on Disability

Title I of the ADA prohibits covered entities from discriminating "against a qualified individual on the basis of disability in regard to . . . [the] discharge of employees[.]"  42 U.S.C. § 12112(a).  In other words, "the ADA bars the discharge of a qualified employee because she is disabled."  *EEOC v. Mfrs. & Traders Tr. Co.*, 429 F. Supp. 3d 89, 102 (D. Md. 2019) (citing *Summers v. Altarum Inst., Corp.*, 740 F.3d 325, 328 (4th Cir. 2014)).  The *McDonnell Douglas* framework applies to this claim.  *Laird v. Fairfax Cnty.*, 978 F.3d 887, 892 (4th Cir. 2020) (citing *Jacobs*, 780 F.3d at 572).  To establish a *prima facie* case of disability discrimination under the ADA, Alston must show that (1) he has a disability; (2) he is a "qualified individual" for the employment in question; and (3) Holy Cross discharged him or took other adverse employment action against him because of his disability.  *Jacobs*, 780 F.3d at 572 (quoting *EEOC v. Stowe-Pharr Mills, Inc.*, 216 F.3d 373, 377 (4th Cir. 2000)).

The Court assumes without deciding that Alston's health condition qualifies as a disability under the ADA and that he was a "qualified individual" for employment.  As for causation, he has not identified any evidence that Holy Cross terminated him because of his disability.  It is undisputed that Elliott, who joined Holy Cross in December 2016 and made the decision to fire

17

Alston two months later, did not know about his health condition.  Without evidence that the decisionmaker knew about his health condition, no reasonable factfinder could conclude that she discharged him because of his condition.  And, as previously explained, the undisputed evidence shows that Elliott fired Alston because she believed he was insubordinate and reckless.  Alston has not raised a genuine dispute of material fact that Holy Cross discharged him because of his disability.

Holy Cross is entitled to judgment as a matter of law on Alston's claim under the ADA for discriminatory discharge.

### 2.  Failure to Accommodate

Alston argues that Holy Cross accommodated his disability for years by allowing him to ask other respiratory therapists to treat patients in negative pressure isolation rooms, which he could not safely work in because he is immunocompromised.  He claims this accommodation was withdrawn when the hospital implemented a policy that required all respiratory therapists to be available to treat all patients.

Title I of the ADA also prohibits discrimination in the form of an employer's failure to make "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability . . . unless [the employer] can demonstrate that the accommodation would impose an undue hardship on the operation of" its business.  42 U.S.C. § 12112(b)(5).  To establish a *prima facie* failure to accommodate claim, a plaintiff must show that (1) he qualifies as an "individual with a disability" within the meaning of the statute; (2) his employer had notice of his disability; (3) he could perform the essential functions of his job with a reasonable accommodation; and (4) his employer refused to make the accommodation. *Reyazuddin v. Montgomery Cnty.*, 789 F.3d 407, 414 (4th Cir. 2015).  An employer may rebut a

*prima facie* case and avoid liability "if it can show as a matter of law that the proposed accommodation will cause undue hardship in the particular circumstances." *Id.*

The Court assumes without deciding that Alston qualifies as an individual with a disability, and Holy Cross does not dispute that Alston could perform the essential functions of his job with a reasonable accommodation.  The Court nonetheless concludes that Alston has not met his burden of establishing that Holy Cross had notice of his disability or that it denied him an accommodation.

As to the notice element, the employee must inform the employer of both the disability and the need for accommodations. *EEOC v. Fed. Express Corp.*, 513 F.3d 360, 369 n.5 (4th Cir. 2008). It is undisputed that Alston told Fields and Fowler in October 2014 that he was immunocompromised and unable to treat patients in negative pressure isolation rooms.  Thereafter, until early 2017, Alston's supervisors allowed him to ask a colleague to treat patients who were in those rooms.  Fields left the facility at some point in 2016, and the record is silent as to whether Fowler was still around when Elliott entered the scene as Interim Acting Chief Nursing Officer in December 2016.  Alston admits that when Elliott allegedly changed Holy Cross policy in early 2017 to require that every therapist must be able to care for every patient, he had not informed her about his medical condition, his inability to treat patients in negative pressure isolation rooms, or his need for an accommodation.  Both Elliott and Ditzenberger denied being aware of Alston's condition, and Alston could not recall whether he ever informed anyone other than Fields and Fowler.  Alston also admitted that the coworkers who complained about having to cover for him did not understand why he could not enter negative pressure isolation rooms.  Because there is no evidence that the Holy Cross employees who advocated for or implemented the alleged policy change knew about Alston's medical condition or his need for an accommodation, he has not met his burden of proof on this element. *See Rock v. McHugh*, 819 F. Supp. 2d 456, 473–74 (D. Md.

2011) (finding absence of notice where the plaintiff's supervisors "repeatedly den[ied] having definite knowledge" of his condition and the plaintiff admitted "that he never informed them").

Alston also has not met his burden of proof as to the final element, that Holy Cross refused to make an accommodation. According to Alston, the denial of an accommodation for his disability was the policy change that occurred after other staff members began to "bicker" when he asked them to take care of a patient in a negative pressure isolation room. ECF 34-2, at 25 (91:13 – 92:5). In response to the complaints, the "higher ups," including Elliott, "called a meeting for the staff and, at that meeting" said that "all therapists must treat all patients." *Id.*[7] The only record evidence of this policy change is Alston's deposition testimony. Assuming the policy did in fact change, it cannot be considered a failure to accommodate. Elliott and the complaining staff members did not know about Alston's medical condition or his need for an accommodation. Alston did not tell them why he needed to avoid negative pressure isolation rooms. He never objected to the policy change, requested an exemption to the policy change, or submitted a formal request for accommodation. And, importantly, Alston was never forced to work in negative pressure isolation room after the policy change. In other words, he was never actually refused an accommodation. The speculative possibility of being denied an accommodation in the future is not enough to sustain a failure-to-accommodate claim. *See Kelly v. Town of Abingdon*, 558 F. Supp. 3d 289, 305 (W.D. Va. 2021) (finding employer did not refuse an accommodation to take short breaks and walks when the plaintiff was allowed to take short breaks and walks despite being criticized by his superiors for doing so); *Jones v. UnitedHealth Grp., Inc.*, 802 F. App'x 780, 782 (4th Cir. 2020) (unpublished) (rejecting retaliation claim based on employer's statement that it

---

[7] Alston stated that he submitted a written copy of the minutes of this meeting "during the initial hearings that [he] had previously." ECF 34-2, at 25 (92:5–8). He did not provide any such document in support of his opposition to the motion for summary judgment.

might require the plaintiff to work with her alleged harasser in the future when the plaintiff "was never actually required to work with" him).  This is particularly true when Holy Cross was not aware of the need for an accommodation and could have altered course regarding the policy change.  Based on the record evidence, no reasonable jury could conclude that Holy Cross denied Alston a reasonable accommodation.

The motion for summary judgment is granted as to Count II.

### C.  Retaliation

Alston claims that his discharge was retaliation under Title VII and the ADA for complaining about the shift assignments, which he perceived favored Walden because Walden is Caucasian and he is African American and has a disability.  Title VII proscribes discrimination against an employee because he "has opposed any practice made an unlawful employment practice by this subchapter[.]"  42 U.S.C. § 2000e-3(a).  The ADA similarly provides that "no person shall discriminate against any individual" for engaging in protected opposition or participation activity. 42 U.S.C. § 12203(a).  "Employees engage in protected oppositional activity when, inter alia, they 'complain to their superiors about suspected violations'" of the employment discrimination statutes.  *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 281 (4th Cir. 2015) (quoting *Bryant*, 333 F.3d at 543–44).

The *McDonnell Douglas* framework also applies to Title VII and ADA retaliation claims. *Guessous*, 828 F.3d at 216 (Title VII); *Jacobs*, 780 F.3d at 577 (ADA).  To establish a *prima facie* retaliation claim and progress to the next step of the *McDonnell Douglas* framework, Alston must prove (1) that he engaged in a protected activity (such as complaining about suspected employment discrimination), (2) that the defendants took an adverse action against him, and (3) that the two events were causally linked.  *See Boyer-Liberto*, 786 F.3d at 281 (quoting *EEOC v. Navy Fed.*

*Credit Union*, 424 F.3d 397, 405–06 (4th Cir. 2005)).  Establishing a causal relationship at the *prima facie* stage "is not an onerous burden" and can be accomplished by, among other possibilities, showing that "(1) the employer either understood or should have understood the employee to be engaged in protected activity and (2) the employer took adverse action against the employee soon after becoming aware of such activity." *Strothers v. City of Laurel*, 895 F.3d 317, 336 (4th Cir. 2018).  Notably, the range of adverse actions that may support a retaliation claim is broader than the range of adverse employment actions that may support an employment discrimination claim. *Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 63 (2006).  Retaliatory actions "need not 'affect the terms and conditions of employment[,]'" but they do need "to be 'materially adverse'—such that they 'might have dissuaded a reasonable worker' from engaging in protected activity." *Strothers*, 895 F.3d at 327 (quoting *Burlington*, 548 U.S. at 63–64, 68).  If the employer provides a non-retaliatory reason for the adverse action, the burden returns to the plaintiff to establish the employer's stated reason is pretext and "that retaliation was a but-for cause of a challenged adverse employment action." *Guessous*, 828 F.3d at 217 (quoting *Foster*, 787 F.3d at 252) (internal quotation marks omitted).  "[A] cause need not work in isolation to be a but-for cause." *Id.*

There is no dispute that Alston complained about perceived racial discrimination in shift assignments, including by emailing those responsible for the shift assignments and reaching out to Human Resources, and that his subsequent termination was a materially adverse action.[8]  The Court assumes that the policy change requiring respiratory therapists to treat all patients is a

---

[8] Alston does not identify evidence that he protested the shift assignments as discrimination based on his disability.  In his deposition testimony, contemporaneous emails, and opposition brief, he indicates only that he suggested the shift assignments were race discrimination.  Thus, he has not established that engaged in any activity protected by the ADA.

materially adverse action that would have dissuaded a reasonable worker with Alston's health condition from engaging in protected activity. But Alston has not presented any evidence that his protected activity caused either adverse action.

As for the policy change, by Alston's own account at his deposition, the change was motivated by complaints from staff who had to cover for him in negative pressure isolation rooms and who did not understand why he needed them to treat patients in those rooms.[9] And Alston admits that Elliott, the person allegedly responsible for the policy change, also was unaware of his health condition and his need to avoid negative pressure isolation rooms. Since neither Elliott nor the complaining coworkers knew Alston had a disability that required him to seek coverage when treating certain patients, they could not know that the policy change would adversely affect him in particular. No reasonable jury could conclude that their conduct was retaliation against him.

As for Alston's termination, the only argument he offers on causation is temporal proximity. Evidence of temporal proximity "tends to show causation[.]" *Foster*, 787 F.3d at 253. Alston began complaining about his shift assignments in October 2016, continued to complain through January 2017, and was terminated in February 2017. The temporal proximity between Alston's protected activity and his termination creates a genuine dispute of fact regarding *prima facie* causation. *See King*, 328 F.3d at 151 (finding *prima facie* causation satisfied at summary judgment stage with evidence of a two-and-a-half-month gap between protected activity and an adverse employment action). But by itself, temporal proximity of a few months "is not sufficient to establish that [the] protected activity was a 'but for' cause of" the adverse action. *Staley v. Gruenberg*, 575 F. App'x 153, 156 (4th Cir. 2014) (unpublished) (citing *Hernandez v. Yellow Transp., Inc.*, 670 F.3d 644, 660 (5th Cir. 2012)); *see also Wilson v. City of Gaithersburg*, 121 F.

---

[9] There is no evidence that Alston's co-workers were aware of his protected activity.

Supp. 3d 478, 485 (D. Md. 2015) (holding three months was "too long a period . . . to establish a causal relationship on temporal proximity alone") (citing *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001)).

Additionally, Alston's evidence of temporal proximity is weakened by the fact that Elliott twice took action against him immediately after becoming aware of his performance issues, as opposed to taking action after becoming aware of his protected activity. A legitimate intervening event that occurs after the protected activity and provides grounds for an adverse action can defeat but-for causation. *See Feldman v. Law Enforcement Assocs. Corp.*, 752 F.3d 339, 349 (4th Cir. 2014) (affirming summary judgment for employer when the plaintiff admitted to a "legitimate intervening event" that occurred after his protected activity and provided grounds for his termination); *Kiel v. Select Artificials, Inc.*, 169 F.3d 1131, 1136 (8th Cir. 1999) (stating "intervening unprotected misconduct eroded any causal connection that was suggested by the temporal proximity")). Elliott met with and counseled Alston on December 30, the day after she heard about Alston's clocking out early without permission. Elliott then terminated Alston the same day she confirmed that he had once again left work early without permission. In light of these legitimate intervening events and Elliot's immediate reactions to them, and for the reasons stated earlier regarding pretext, no reasonable juror could find that the proffered reason for Alston's termination is pretext for retaliation.

The motion for summary judgment is granted as to Count III.

### D.  Hostile Work Environment

Alston has not informed the Court clearly whether he asserts a hostile work environment claim, and if so, under which statute. In his amended complaint, Alston called Count IV a hostile work environment claim under Title VII. ECF 13, at 11 (citing 42 U.S.C. § 2000e, *et seq*.). But

in his allegations, he stated he believed that he was subjected to a hostile work environment "based on his weakened immune system resulting from his Kidney Disease." *Id.* ¶ 69.  Holy Cross, in its summary judgment motion, interpreted Count IV as a hostile work environment claim based on Alston's alleged disability.  ECF 34-1, at 16–17.  In Alston's opposition, he appears to change the nature of this claim entirely, stating it is for "ADA hostile work retaliation," reciting the elements of an ADA retaliation claim under *Reynolds v. Am. Nat'l Red Cross*, 701 F.3d 143, 154 (4th Cir. 2012), and applying the evidence to the elements of a retaliation claim.  ECF 35, at 22–24.

Alston does not address the law on hostile work environment claims or explain how the evidence supports such a claim.  A failure to respond to an argument in a dispositive motion is deemed an abandonment of the associated claim.  *See, e.g.*, *Ferdinand-Davenport v. Children's Guild*, 742 F. Supp. 2d 772, 777 (D. Md. 2010) ("By her failure to respond this argument, the plaintiff abandons any discriminatory discharge claim."); *Mentch v. E. Savings Bank, FSB*, 949 F. Supp. 1236, 1246–47 (D. Md. 1997) ("[The plaintiff] abandoned her harassment claim by failing to address that claim in her opposition to [the defendant's] motion for summary judgment[.]").  The Court finds that Alston has abandoned any hostile work environment claim, whether it is based on the ADA or Title VII.

Even if the claim had not been abandoned, it would fail as a matter of law.  A hostile work environment exists when "the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."  *Boyer-Liberto*, 786 F.3d at 277 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)).  To "prevail on a Title VII claim that a workplace is racially hostile, 'a plaintiff must show that there is (1) unwelcome conduct; (2) that is based on the plaintiff's . . . race; (3) which is sufficiently severe or pervasive to alter the plaintiff's conditions

of employment and to create an abusive environment; and (4) which is imputable to the employer.'" *Id.* (quoting *Okoli v. City of Baltimore*, 648 F.3d 216, 220 (4th Cir. 2011)).  Under the ADA, the standard is similar: a *prima facie* case consists of evidence that "(1) [the plaintiff] is a qualified individual with a disability; (2) [he] was subjected to unwelcome harassment; (3) the harassment was based on [his] disability; (4) the harassment was sufficiently pervasive as to alter a condition of employment; and (5) some factual basis exists to impute liability for the harassment to the employer."  *Rohan v. Networks Presentations LLC*, 375 F.3d 266, 272 n.9 (4th Cir. 2004) (quoting *Fox v. Gen. Motors Corp.*, 247 F.3d 169, 177 (4th Cir. 2001)).[10]

The "severe or pervasive" element "has both a subjective and objective component." *Perkins v. Int'l Paper Co.*, 936 F.3d 196, 208 (4th Cir. 2019).  "Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive—is beyond" the purview of the employment discrimination statutes.  *Oncale v. Sundowner Offshore Servs. Inc.*, 523 U.S. 75, 81 (1998) (quoting *Harris*, 510 U.S. at 21).  When deciding the objective component of a hostile work environment claim, courts consider "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."  *Harris*, 510 U.S. at 23.  "[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment."  *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998).  "[C]omplaints premised on nothing more than rude treatment by [coworkers], callous behavior by [one's] superiors, or a routine difference of opinion and

---

[10] To the extent Alston claims he was subject to retaliation in the form of a hostile work environment, he still would have to establish the elements of a hostile work environment. *Fordyce*, 43 F. Supp. 3d at 552 n.10.

personality conflict with [one's] supervisor . . . are not actionable[.]"  *EEOC v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 315–16 (4th Cir. 2008) (internal quotation marks and citations omitted).

Alston has not offered any evidence from which a reasonable jury could conclude that he experienced harassment that was severe or pervasive enough to constitute a hostile work environment.  He submits no evidence that he was intimidated, ridiculed, insulted, or humiliated.  The record evidence shows that his shift assignments changed, his employer announced a policy change that would have conflicted with an accommodation for his disability, he received counseling based on reported misconduct, and he was subject to increased scrutiny regarding his practice of leaving work early.  Generally, "unfavorable personnel actions[] do not constitute a hostile work environment."  *Carrico v. Prince George's Cnty. Gov.*, No. TDC-17-822, 2020 WL 1434102, at *5 (D. Md. Mar. 24, 2020) (citing *Perkins*, 936 F.3d at 208–09).  To the extent the policy change might have posed a threat to his health, the risk never materialized because Holy Cross never required him to treat patients in a negative pressure isolation room.

Additionally, as the Court has explained, Alston has not offered sufficient evidence that the challenged conduct was motivated by his race, disability, or protected activity.

The motion for summary judgment is granted as to Count IV.

## IV.    Conclusion

Holy Cross has established that there are no genuine disputes of material fact and that it is entitled to judgment as a matter of law on each of Alston's claims.  The motion for summary judgment is granted.  A separate order follows.

Date: March 31, 2023

Deborah L. Boardman
United States District Judge